United States versus Xavier Okay, Mr. Cooley. Good morning, everybody may please the court Kevin Kulik and Ashley K on behalf of Maurice Xavier. Mr. Gibson on behalf of his client. Carleen Marie's right. Essentially judge. The, the way this case went. When the case began, it was sort of a wordless actionless conspiracy alleged against our client he's not alleged to have said anything to anybody or done anything. One witness alleged that he may have signed some checks, she had a 60% identification on that. So we were kind of taken aback when it turned out that the government's case was based upon a premise that we had not thought of before the trial began the, the records by the government, clearly established that my client had a business that involved a mortgage business a money services business, including a check cashing store, and that these two places were at different locations. This was very easy to detect. When it turned out that this was their case that this was going to be how they made their case we actually had to go out and take pictures of our check cashing store. To establish that it even existed, the government took the position that it did not exist, even though the address for this business was clearly established in all of the records in government's exhibit 67 be. Basically, it would be impossible to miss, but essentially the way the scam worked is the same way the scam worked in this. In a lot of cases that we had in this jurisdiction. It was a case where the tax returns of dead people were submitted checks were obtained and then the checks were taken to a check cashing store and cash. Check cashing stores were targeted by individuals who were doing this. The government's case was basically that our clients business was so shabby. It was so unadvertised. It was such an inside job that no member of the public had ever gone there and the checks were cashed at this place that, you know, was set up. It must have been purely for the purpose of cashing these checks from these deceased people. So in your response is that no, no, no. The legit check cashing place was at a different location in Oakland Park. Do I have that right or something? Which is in all the records. We even took pictures of it. It's properly advertised. It's also stringently regulated as a money services business. But all the records were. I thought I understood from the record that it really was only at that location for about a month. Like it moved from Sunrise to Oakland Park and then maybe back to Sunrise. No, no. This is not true at all. In fact, we went out and took pictures of it during the trial. Okay. I'll check that. Okay. So essentially the government's supposition was that my client was in on it with the people that had done the tax returns and obtained the checks. We had a third co-defendant who was acquitted. He actually testified about how this happened. He said that he met with some people that were not involved with my client or Mr. Gibson's client, that they had set him up with these tax returns, that they had obtained the checks, and that he went to my client's check cashing store. And the records are going to show two account numbers. One account number is for the university drive address. The other account number is for the check cashing store, which is where all the checks were cashed. And the government basically took the position throughout the trial that the check cashing store did not exist. This was very strange for us. It was difficult to even defend at this point at the last minute. We didn't know how the government was going to try to prove this case against our client because not a single witness testified that he was involved in any of this. Basically, the checks were taken to the check cashing store. They were given to a person named Antonio Duval, a Harvard-educated manager who ran the check cashing store for my client, and they cashed the checks. Whether Mr. Duval was in on it or not, we don't know at this point. This would be the main focus of our investigation if we get to try this case again. But basically, all you need if you have the illegitimate tax return of a deceased person is a friendly cashier at a check cashing store. You can either know him, bribe him, whatever, but if you walk in and he gives you the cash, the only thing that happens to the check cashing store owner is that he gets the normal percentage that he would get for cashing any check, which is the only thing the government was able to show in this case. The people actually getting the money were the third co-defendant who was acquitted in the case and whoever he was involved with initially that he had to go back to. He testified that this was a person named Crazy C. During the course of the trial, it turned out to be a person named Fertillion who's apparently in federal prison on a very similar case right now. Okay. We have your opening, Mr. Gibson. Good morning. Good morning. Peace to the court. I'm Joe Gibson. I was blindsided when Bradley Cohen testified in the sentencing hearing and Judge Zlot by my recollection took a break and the undisclosed email, the undisclosed document that was not part of the bait stamp discovery provided to us pre-trial. It was disclosed, no? No, it was not. In fact, it was not part of the Exhibits 34 through 43 that were Xavier emails. I don't believe that other than anecdotally with Exhibit 38 that was presented on July 18, 2016 through Special Agent Bradley Cohen accepted on that same date was Xavier emails with Carleen Maurice. Notwithstanding that, I don't believe there were any emails presented in the case in chief regarding Carleen Maurice. And quite frankly, the explanation by Bradley Cohen, which I'll feature at this moment, pursuant to page 57 of 76 of the government's brief where the government concedes that Bradley Cohen was unable to give us the vintage. Should I say the genesis of how a document addressed to Carleen Maurice ended up in the possession of the co-defendant? And certainly there was no practical explanation of how that came to be. In fact, the government says, quote, at Maurice's sentencing hearing, Agent Cohen testified he was uncertain about the circumstance in which he had learned of Maurice's P-10. Going further, quote, he stated that he might have discovered it within co-defendant Xavier's emails, which were obtained through a search warrant or through the official IRS records. If the government can't tell us how they got it, they certainly didn't get it from us. There were no affidavits or search warrants that I'm aware of that were executed with respect to any email container of Carleen Maurice. And so the upshot of that is that we were completely caught. It certainly would then conflate. I thought that the government had included in its exhibits and disclosed beforehand all of Xavier's emails. Not to us. As I understand the distinction, the books and records of a defendant go to that defendant, not to co-defendant. And quite frankly, that requirement may have been followed. I believe it was. But in our tranche of information, which we thoroughly went through and bait-stamped, there was no document in the possession of Maurice Xavier that was given to us. Particularly not that document. And again, when the time to explain what happened to it in the record came, it came and went without there being an explanation. Oh, by the way, we gave it to him on this date and time. So you're telling me the government didn't provide you with all of its exhibits? I'm saying that, Your Honor, that the government did not provide us with the letter of the government IRS directed to Carleen Maurice that was in the possession of Maurice Xavier. Let me tell this honorable panel why that's important. Because the ratio of how the government tried the case was that the P-10 was like one social security number to be protected. And so the unspoken question, sometimes the issue being discussed is not the issue, was how did it come to be in the possession of Mr. Maurice's co-defendant? And how was it that on all of these filings, virtually all, that may be hyperbolistic, it was Carleen Maurice's P-10 that was used. She didn't sign any tax returns. Her P-10 was used. And so then the upshot of that is if a co-defendant is in possession of a P-10 that was purloined, that explains it. And certainly that is something that should have been shared pretrial. But just so we're clear, so at page 41 of the government's brief, when it says, Maurice's Brady claim fails because all of the government's exhibits, including co-defendant Xavier's emails, were furnished to her in discovery, rendering them within her possession, you say that is simply untrue. I'm saying that it's counterfactual to the allegation made at page 57 and 58 of that very same brief. But so in short answer to my question, that's untrue. Well, they can't both be true. It can't both be that the government did not know. Fine, but you say this statement is not true, and then we'll ask the government about it when they stand up. I'm saying we never saw it. We did look. I'm saying that when confronted with it in the record in front of Judge Locke, they did not say they gave it to us. In fact, what was actually said under oath, and I don't want to – Were you given all the government's exhibits before trial? Apparently not. Apparently not. Apparently not. And again, we deal with the question of the letter from the government, just like that, from the government to Carlene Maurice in possession of Bradley Cohen, who produced it at sentencing. There is no indication from the government in front of Judge Locke at that time that they had earlier produced it. And now we're dealing in some revisionism because now by brief they're saying they produced it. They didn't tell Judge Locke when the document came up, oh, by the way, we gave it to them. That's what I'm saying. That's a different question. I'm sorry, Your Honor. Whether they said it to Judge Locke or not. Yes, sir. Did they produce it? I never saw it. Did they produce – no, that's not the question, is it? Yes, sir. Because it is possible that it was produced and you didn't see it. That is possible. That is possible. Okay. That doesn't give rise to a Brady or a Giglio claim, does it, if they produced it and you didn't see it? It wouldn't, no. So that goes to the heart of the question. Did they produce it? I can only go by what I examined over months and what I saw. You're not denying that they may have? I can't actually say that. They may have and I would have missed it. You've saved some time for rebuttal. Thank you, Your Honor. Appreciate it. Maybe we should start there. Yeah. Page 41 of your brief, we disclosed all of Xavier's emails to codefendant. Yes, and Mr. Xavier's emails, none of them contained Carlene Maurice's PTIN. They were not in there. And so it's very confusing and I think Agent Cohen created some confusion when he testified at sentencing that he didn't know how he had discovered Carlene Maurice's PTIN. It could have been in the emails or it could have been in the IRS records. He testified at trial that he discovered it in the IRS records. It wasn't in the emails and so there's no problem with that. And there's no problem because the emails did reflect that there were a certain email address used by Carlene Maurice, a certain email address used by Mr. Xavier and Mr. Xavier communicated with the third defendant, Mr. Alexandri, through that email. And he also communicated with Carlene Maurice through that email. These are all red herrings and what we have is repetition of what we had at trial, which was could it have been this, could it have been that, could it have been the other. This was a very contentious trial. It was very document intensive. All the government exhibits were produced. Ms. Harmon, you represent in your brief that the government produced all its exhibits. Yes. And I still need to tell you this. It doesn't strike me that Mr. Gibson has necessarily denied that. How can I determine from the record that your representation is true? I think you can look through the emails that Mr. Gibson is talking about from Mr. Xavier's email account and see that there's nothing in there about Carlene Maurice's PTIN. That doesn't seem responsive to me. I understand that point. That seems to be a different point about whether the email really is responsive to his argument. But if you assert in your brief that the government produced all of its exhibits before trial. Yes. I take it there was an exhibit list. Yes. It was filed with the district court, right? Yes. Before trial. Yes. If a defendant saw that exhibit list which would have been served on the defendant and thought that it had not been provided something that was in the list, it could have objected. The defendant could have objected, right? Yes. And all the emails were in the exhibits. That's what I can figure out from the record. Yes. Is that the answer to my question? Yes. And in fact, Mr. Gibson did use Mr. Xavier's emails in his case at trial. So he did have possession of them and he did try to make effective use of them to try to move Ms. Maurice out of this tax filing conspiracy for dead people. And I think if you look at the sheer number of returns that were filed in January of 2011 and the fact that they all have Ms. Maurice's, Carly Maurice's PTIN number on them and there's nothing else being done there as ATAS and ATAS2 and BFS and all these businesses. And it gets very confusing with the businesses. I don't know, Mr. Kulik did use effectively at trial the notion that Mr. Xavier was merely a sloppy business manager and he didn't know what the tellers were doing in his check-cashing business in running these refund checks for dead people through the business. But that's counter to what Mr. Xavier had said in his representation to the regulators for his money services business at BFS when he said, I only cash checks for my clients. These couldn't conceivably be clients because they were all dead people. So it's just we're in this loop here we can't seem to get out of. However, all these arguments were presented at trial. They were presented to the jury. The jury was properly instructed on what they had to find to find these defendants guilty. They obviously sorted through the evidence because they acquitted Mr. Alexandre and found these two defendants guilty. And there's nothing more to say except I would urge the court to look at the closing arguments of counsel where all these things, all these possibilities were arrayed for the jury effectively and the jury rejected it and we can't go back and redo that. So if the court has no other questions, I would ask that the defendant's convictions be affirmed. Thank you. Thank you, Ms. Herman. Mr. Kulik, you saved two minutes. I just want to make clear that the note that the prosecutor is referring to is from 11-17-2009. At this point, Mr. Xavier only had the one business. He did not open a check-cashing store yet. In it, he basically apologizes for not full compliance. In the government's records, 67B, he opens a check-cashing store. October 15, 2010, he then surrenders the license 3-5-2012. These are the dates that encompass all of the checks in the case. And I also wanted to clarify earlier that we had a witness who testified that she saw the store. We produced pictures. We did get the pictures during the trial. They were Google map pictures the witness testified to, so they weren't taken during the trial. I didn't mean to imply that to the court. They were the pictures that were taken during the time period when the check-cashing store was cashing all of the checks in this case. The note that the government continues to refer to is part of their theme of denying that the check-cashing store ever existed because the note was written before the check-cashing store was opened, according to their own records. If the check-cashing store exists, it's basically impossible to convict my client in the case because that means that the perpetrators were going into his check-cashing store when he wasn't even there. There's no evidence that he was there cashing the checks, getting the money, walking out with the cash. The person that's endorsing all of the checks on behalf of the store is an employee of my client. There's no evidence that my client knew anything that was going on in the check-cashing store. The government even called the owner of another check-cashing store who was not charged with a crime who said the same thing happened to him from the same perpetrators. Thank you. Thank you. Mr. Gibson. Your Honor, to put this in context, there were hundreds of thousands of e-mails, and the vet probably took us five months. And so we would go through, I don't know, 2,000, 3,000 a day and sort them out on the e-mails. But when I heard the government just indicate, and I have no reason to disagree with it, that this letter was not part of the e-mail tranche. It was a letter. And the letter, then, how this paper came into possession of Special Agent Bradley Cohen. And so part of the mischief I find in my own head, intellectually, because I can't say that I'm perfect, that I missed it, I go back to the exhibit list. It is not mentioned. And, in fact, it wasn't a part of any Q&A during the trial. It came out on the issue at sentencing because the government's basis was she had to give him the P-10. How else did he get it? At which time it was then shared at sentencing in front of Judge Locke. Oh, by the way, we found this letter in the possession of Mr. Xavier pursuant to a search warrant of Mr. Xavier's possessions. And that's when we first learned of it. I will say this impactfully, that it's not a plain error standard. If, in fact, it is a Brady violation, that would be de novo. If, in fact, it wasn't shown to us during trial. And it certainly affected what we would have placed in front of the judge on the motion to sever because our defenses were antagonistic. I want to be clear in the last 22 seconds I have. Colleen Maurice did not know the acquitted co-defendant. Colleen Maurice did not get the money. Colleen Maurice did not sign the checks. Colleen Maurice, in fact, the signature card that implicates her was actually given to the co-defendant, allowed to take somewhere else and bring it back with a signature of hers that she contests was not hers. Thank you, Mr. Judge. Thank you, Judge. Mr. Kulik, I note that you were court appointed. Thank you for accepting the appointment. Thank you for your attention.